Hillsborough-northern judicial district
No. 2002-469

JUNE BALKE & a.

v.

CITY OF MANCHESTER

Argued: May 8, 2003
Opinion Issued: September 30, 2003

*Baldwin, Callen & Hogan, PLLC*, of Concord (*Jed Z. Callen* on the brief and orally), for the plaintiffs.

*Daniel D. Muller, Jr.*, office of city solicitor, of Manchester, on the brief and orally, for the defendant.

*Peter W. Heed*, attorney general (*Mary P. Castelli*, senior assistant attorney general, on the brief and orally), for the State, as *amicus curiae*.

NADEAU, J. The defendant, City of Manchester (city), appeals a decision by the Trial Court (*Lynn*, J.) that interprets RSA 485:14 (2001) to require approval by the voters of each municipality in which residents use water provided by the Manchester Water Works (MWW) before MWW can provide fluoridated water to any residents of the community. We affirm.

The plaintiffs, residents of Manchester and five surrounding municipalities, filed a petition for declaratory judgment, injunctive relief and damages in the superior court, arguing that the city had violated RSA 485:14 by fluoridating its water supply prior to conducting public hearings and obtaining voter approval in other municipalities which MWW served.

The plaintiffs' request for a preliminary injunction to stop the fluoridation of the water supply was denied. Both parties moved for summary judgment on the statutory violation claim, and each objected to the other's motion. The trial court granted the plaintiffs' motion for summary judgment, ruling that the city had violated RSA 485:14, and ordered the city to cease fluoridation by April 2004 unless a legislative remedy was enacted or the surrounding towns voted to approve the fluoridation. The city filed a timely motion for reconsideration, which was denied. This appeal followed.

The trial court found the following facts. The MWW was established by a special act of the legislature in 1871 and has operated as a department of the city since that time. In addition to providing water service to residents and businesses in the city, MWW extended its water distribution system to include areas outside the city limits of Manchester sometime in the 1920s. At the present time, MWW has direct retail customers (*i.e.*, residential or business properties that are connected to the MWW pipeline system) in the towns of Auburn, Bedford, Goffstown, Hooksett and Londonderry. MWW also has entered into wholesale water contracts with the Town of Derry, the Grasmere Water Precinct, the Central Hooksett Water Precinct and Pennichuck/Consumers New Hampshire Water Company. These wholesale customers in turn provide water service to retail customers in Bedford, Derry, Goffstown, Hooksett and Londonderry.

Because an MWW "customer," whether wholesale or retail, simply means a "connection" to its pipeline system, there is no easy way to correlate the number of customers with the actual number of consumers of MWW water. A "connection" may vary from a single family home to a duplex, a large apartment complex, or a commercial establishment. Despite this difficulty in correlating connections with consumers, the parties appear to have agreed at trial that MWW provides water service to over 99% of the residents of the city. The parties also agreed that the "connections" outside the city limits of Manchester account for between 20% and 30% of MWW's total connections.

The parties disagreed as to the percentage of the population served by MWW in each of the satellite towns. Based upon demographic information and information supplied by the New Hampshire Department of Environmental Services (DES), the city estimated that these percentages range from a low of 4.7% for Auburn to a high of 44.1% for Derry. The plaintiffs, on the other hand, proffered an analysis prepared by an architect they retained as an expert, who opined that the percentages range from 8% for Auburn to 57% for Hooksett.

Following a public hearing conducted by the city pursuant to RSA 485:14, a question was placed on Manchester's 1999 municipal election ballot asking the voters to decide whether the city's public water supply should be fluoridated. By a margin of 11,594 to 10,938, the vote was in favor of adding fluoride to the water supply. No similar public hearings or referendums were held in any of the other towns that are serviced by MWW, although MWW did notify officials of these towns of its plans to fluoridate the water. The city began adding hydrofluorisilic acid (HFS) to the water supply on December 19, 2000. In June 2000, the city obtained approval of its fluoridation plan, including the use of HFS, from DES pursuant to RSA 485:8 (2001).

The sole question on review is one of statutory interpretation. The city argues that the trial court's interpretation of RSA 485:14 is inconsistent with the rules of statutory construction and the historical treatment of water companies in this State. In particular, the city argues that (a) the trial court failed to construe the plain language of RSA 485:14 and the referendum statutes incorporated therein as a whole, (b) the trial court's interpretation of RSA 485:14 conflicts with the statutory scheme and other legal principles, and (c) the trial court's interpretation of RSA 485:14 leads to absurd and unjust results.

This court is the final arbiter of the legislature's intent as expressed in the words of the statute considered as a whole. *See In the Matter of Breault & Breault*, 149 N.H. 359, 361 (2003). We first examine the language of the statute, and, where possible, ascribe the plain and ordinary meanings to the words used. *Id.* When a statute's language is plain and unambiguous, we need not look beyond it for further indication of legislative intent, and we refuse to consider what the legislature might have said or add language that the legislature did not see fit to incorporate in the statute. *Id.* Furthermore, we interpret statutes in the context of the overall statutory scheme and not in isolation. *Id.*

RSA 485:14 provides:

> No fluorine shall be introduced into the water of any lake, pond, reservoir or stream tributary from which the domestic water supply is taken unless and until the municipality using said waters has held a public hearing as to the introduction of fluorine into the public water supply of said municipality, and the voters of such municipality have approved such action pursuant to RSA 44:16 or 52:23.

We first address the argument that the plain language of RSA 485:14, read together with the referendum statutes incorporated therein,

requires only that there be a referendum in the municipality that runs the water system. The city argues that the language requiring a referendum by the "municipality using said waters" is ambiguous, and contrasts that wording with other possible formulations that would have been clearer, such as "a municipality within which said waters are used." We agree, however, with the trial court's interpretation of "municipality using said waters." It would be illogical to read the statute to require a referendum vote only when a municipality *as a municipality*, rather than its residents, uses fluoridated water from MWW. We believe it obvious that the statute is concerned with the use of fluoridated water by individuals, not by municipalities as corporate entities. Reading the language in context, the use of the word "municipality" is to designate the municipality as the entity that would hold a referendum for approval of fluoridation of the public water supply: "No fluorine shall be introduced into the water . . . until the municipality . . . has held a public hearing . . . and the voters of such municipality have approved such action." RSA 485:14.

■ The city argues that "'[p]ublic water system' is a term of art under the current statutory scheme," a term used in the referendum before the voters under RSA 44:16: "Shall permission be granted to introduce fluorides into the public water system?" The trial court's interpretation, the city argues, means that MWW is the public water system of every municipality to which MWW provides water, and this contradicts RSA 38:24. We note, however, that RSA 485:14 does not use the term "public water system," but rather the terms "public water supply" and "domestic water supply." *See* RSA 485:14. As the other statutes within the statutory scheme make clear, the legislature knows how to use the term "public water system," and we will not add words that the legislature has chosen not to include. *See Breault*, 149 N.H. at 361. Furthermore, the use of the word "domestic" synonymously with the word "public" when referring to the water supply in RSA 485:14 strengthens our conclusion that the legislature intended to regulate waters used by private individuals within a municipality, not merely the use of water by a municipality as a public, governmental body.

■ The city and the State argue that the plain language of the statute requires a referendum vote only by the municipality that owns and operates the water system, not every municipality in which a resident receives water from the water system. We disagree. The statute requires a public hearing in each "municipality *using* said waters," not merely the municipality that introduced the fluorine into the water. RSA 485:14. Any municipality that has residents using water from MWW is a "municipality

using said waters" within the meaning of RSA 485:14. Therefore, we agree with the trial court that "before a public water supply which is used within a municipality may be fluoridated[,] there must be a hearing and referendum in that municipality."

The city argues that the trial court's interpretation of RSA 485:14 leads to absurd and unjust results. Among other things, the city notes that a vote against fluoridation in one small municipality could prevent fluoridation of an entire water system, even if the other municipalities approved it, and that the failure to satisfy the prerequisites to referendum in any municipality would defeat fluoridation for all municipalities using the water system. Although those concerns are valid, these difficulties are the natural result of the statutory language adopted by the legislature. While the city's interpretation might avoid these concerns, it would cause other, equally troubling difficulties. For example, if only the municipality owning the water system were required to approve fluoridation, one small municipality owning a water system could hold a referendum on fluoridation among its voters, and then provide fluoridated water to numerous large municipalities without the residents of the large municipalities having a vote.

Finally, the State argues that regulations and the overall statutory scheme place responsibility for the operation of the water system upon the municipality that operates the system, and "placing responsibility for the operation of the water system upon the municipality which operates the system is critical to the success of the statutory scheme." Thus, the State argues, only the municipality that runs the water system should be required to approve fluoridation by referendum. As difficult as it may be for the city to comply with the statute as currently written, we are constrained by the clear and plain language of RSA 485:14. We will not rewrite the statute; that is the province of the legislature. The trial court's order, decided in June of 2002, did not require the city to "cease and desist from fluoridating the water supplied, directly or indirectly, to any properties located in the towns of Auburn, Bedford, Goffstown, Hooksett or Londonderry" until April 1, 2004, thereby allowing the legislature time to consider whether to amend RSA 485:14. We agree with this approach, and therefore affirm the order of the trial court, but extend the time for compliance to June 30, 2005.

Finally, having reviewed the record regarding the city's remaining arguments, we conclude that they either have been waived or are without

74

merit and warrant no further discussion. *See Vogel v. Vogel,* 137 N.H. 321, 322 (1993).

*Affirmed.*

BROCK, C.J., and DALIANIS and DUGGAN, JJ., concurred.